**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                                      :   Chapter 11
                                                            :
CLARUS THERAPEUTICS HOLDINGS,                               :   Case No. 22- (_____)
INC., *et al.*,                                             :
                                                            :   (Joint Administration Requested)
           Debtors.[1]                                      :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF LAWRENCE R. PERKINS IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Lawrence R. Perkins, being duly sworn, depose and say:

1.      I am the Chief Restructuring Officer ("CRO") of the above-captioned

debtors (the "Debtors" or the "Company") and debtors-in-possession in the above-captioned

chapter 11 cases (the "Chapter 11 Cases").  I was appointed CRO on September 5, 2022.  Prior to

being appointed as CRO, I served as a financial advisor to Debtor Clarus (defined below) since

November 2020.

2.      I am also the Founder and Chief Executive Officer of SierraConstellation

Partners ("Sierra").  Sierra has provided financial advisory and consulting support to me in my

roles with the Debtors since my original appointment, and this support is proposed to continue in

this capacity during the Chapter 11 Cases.

3.      I have over 20 years of management consulting and advisory experience

with distressed companies or companies undergoing transition.  I have held senior roles in various

industries including healthcare, industrial manufacturing, retail, real estate, and financial services.

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer
identification number, are Clarus Therapeutics Holdings, Inc. (1852) and Clarus Therapeutics, Inc. (7717).  The
Debtors' corporate headquarters is located at 555 Skokie Boulevard, Suite 340, Northbrook, Illinois.

4.      In my capacity as financial advisor and, more recently, CRO, of the Debtors, and because of my discussions with the Debtors' employees, consultants, professionals and Boards of Directors (the "Board"), I have become generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  To minimize any disruption resulting from the filing of the Chapter 11 Cases, as well as other possible adverse effects on their business, the Debtors will file various motions and pleadings seeking certain "first day" relief (collectively, the "First Day Motions").  I submit this declaration (this "Declaration") to assist the Court and parties-in-interest in understanding the circumstances compelling the commencement of the Chapter 11 Cases and in support of the Debtors' chapter 11 petitions and the First Day Motions.

6.      Except as otherwise indicated herein, all statements set forth in this Declaration are based on: (i) my personal knowledge of, and familiarity with, the Debtors' operations, finances, and restructuring efforts; (ii) my review of relevant documents and information provided to me by employees of, or advisors to, the Debtors or professionals retained by Debtors;  (iii) my opinion based on my experience and knowledge of the Debtors' operations and financial and business affairs, including my general knowledge of the industry in which the Debtors operate: (iv) information supplied to me by and consultation with other members of the Debtors' management and the Debtors' professional advisors; and/or (v) my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I have obtained this information during my tenure working with the Debtors and their

professionals, including the Debtors' corporate and restructuring counsel and investment bankers. In making this Declaration, I also have relied on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration.

7.      My investigation of the Debtors' operations and circumstances is ongoing. To the extent that I learn that any information provided herein is materially inaccurate, I or the Debtors will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge.

8.      I am authorized to submit this Declaration on behalf of the Debtors and am over the age of 18.  If called upon to testify, I would testify competently to the facts set forth herein.

9.      This Declaration is divided into two parts.  Part I provides background information regarding the Debtors, their business, their capital structures and the circumstances surrounding the commencement of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Motions.

**PART I.**

A.      **The Debtors' Business and Operations**

10.      Headquartered in Northbrook, Illinois, Debtor Clarus Therapeutics, Inc. ("Clarus") was founded in 2004 by Dr. Robert Dudley as a specialty pharmaceutical company focused on developing androgen and metabolic therapies for men and women.  Dr. Dudley, the Company's President and Chief Executive Officer, has over 30 years of experience in the testosterone replacement therapy ("TRT") field and led the discovery, development, regulatory approval and launch of AndroGel, the first topical T-gel product and most successful TRT product developed and commercialized to date, worldwide.

3

11.     Millions of patients are treated yearly for male hypogonadism—testosterone deficiency accompanied by an associated medical condition—but prior to Clarus' development of JATENZO (defined below) there were no safe oral TRT[2] options available for patients.    Existing options for patients were and still are comprised primarily of non-oral testosterone treatment, including gels, injectables and patches.    Clarus believed that users of TRT were not satisfied with these options, which suffer limitations due to their routes of administration and ease of use, thus leading to high discontinuation rates and increased administration burden on both patients and healthcare providers.

12.     In March 2019, Clarus' mission to bring a new, state-of-the-art oral TRT to the market was realized when the U.S. Food and Drug Administration (the "FDA") approved JATENZO® (testosterone undecanoate oral capsules) ("JATENZO").    JATENZO is the first oral TRT of its kind to receive final approval by the FDA.

13.     JATENZO is available in three capsule strengths for twice daily administration with food.    In a pivotal Phase 3 trial of JATENZO, an open-label study designed to evaluate the efficacy and safety of JATENZO in adult hypogonadal male subjects referred to as the 'inTUne trial', JATENZO was evaluated for safety against Axiron, a then commonly prescribed topical testosterone formulation.    JATENZO achieved the primary endpoint, with 87% of patients treated with JATENZO achieving an average testosterone level in the normal male range by the end of the trial period and in some cases in as little as seven days.    JATENZO also improved classic signs and symptoms associated with hypogonadism.    JATENZO's safety profile was consistent with the profiles of previously approved TRT products.    Importantly, JATENZO

---

[2]     Prior to JATENZO, the only oral TRT option was methyltestosterone, which carried a significant risk of serious liver toxicity.

was not associated with liver toxicity in any of the Phase 3 studies conducted to support FDA approval.

14.     In February 2020, Clarus commenced U.S. commercial sales of JATENZO. In the year ended December 31, 2020, JATENZO generated net revenue of approximately $6.4 million.  Despite the COVID-19 pandemic, which had a profoundly negative effect on Clarus' ability to market JATENZO to health care providers, Clarus achieved prescription growth month-over-month during the first year of its launch as a result of Clarus' increasing educational efforts and increasing commercial payer coverage.  For the year ended December 31, 2021, JATENZO generated net revenues of approximately $14.0 million.  JATENZO is the Debtors' sole source of revenue and sales are exclusively within the United States.

15.     The Debtors' sales of JATENZO, like most pharmaceutical products, depend to a significant degree on the availability of coverage and reimbursement by third-party payers, such as government and private insurance plans.  Currently, most of the Debtors' prescriptions are open access, and the Company has negotiated agreements with several pharmacy benefits managers, including Express Scripts.

16.     As of June 30, 2022, JATENZO was available under health plans representing approximately 71% of all insured lives in the United States.  Of these lives, approximately 74% of them with commercial insurance had access to JATENZO.

17.     The Debtors offer a co-pay assistance program to patients for JATENZO under which patients covered by commercial pharmacy benefit plans receive discounts on their prescriptions. The Debtors' JATENZO GO Co-pay Assistance Program provides financial support to most commercially insured patients to assist with out-of-pocket costs of JATENZO, such that most commercial covered patients will pay $0 for their prescription.

18.     Similarly, to ensure coverage by Medicare Part D and commercial pharmacy benefit plans, the Debtors participate in certain rebate programs, which provide discounted prescriptions to qualified insured patients.  Under these rebate programs, the Debtors pay a rebate to the third-party administrator of the program.

19.     The Debtors also provide discounts to authorized users of the Federal Supply Schedule ("FSS") of the General Services Administration under an FSS contract negotiated by the Department of Veterans Affairs, including discounts mandated by the Veterans Health Care Act, discounted prescriptions to Department of Defense's TRICARE retail pharmacy program, and discounts to federal grantees and safety net providers referred to as covered entities pursuant to the Debtors' pharmaceutical pricing agreement with HHS and the 340B drug discount program, which is required as a condition of Medicaid coverage.  Government agencies ordering under the FSS and covered entities purchase products from the wholesale distributors at the discounted price, and the wholesale distributors then charge back the difference between the current wholesale acquisition cost and the price the entity paid for the product.

20.     The Debtors have established a comprehensive supply chain for commercial manufacture of JATENZO capsules.  The Debtors rely on contract manufacturers to produce the drug substance (i.e., pure testosterone undecanoate; "TU") and drug product (TU dissolved into its final liquid formulation and filled into softgel capsules) required for commercial supply and clinical studies.  The Debtors have qualified two sources of bulk TU, entered into a manufacturing relationship for the manufacture of the softgel capsules and engaged with a commercial packager for the production of finished JATENZO capsules.  All lots of drug substance and drug product used for the commercial supply and clinical studies are manufactured, packaged and labeled under current good manufacturing practices ("cGMP").  The Debtors have established an internal quality

control and quality assurance program, including a set of standard operating procedures and specifications that the Company believes is cGMP-compliant.

21.    The Debtors' primary goal has been to make JATENZO the preferred choice for TRT among men with hypogonadism, with a broader vision to become a pharmaceutical company focused on the development and commercialization of testosterone and metabolic therapies for men and women.  Although the Debtors had plans for several life cycle management projects for JATENZO that include a label expansion to treat hypogonadal men with chronic kidney disease, development of a once-daily oral TU and a label expansion to provide testosterone therapy for female-to-male transgender individuals, these initiatives were put on hold given the Debtors' liquidity constraints.

B.    **The Debtors' Corporate Structure**

22.    Clarus Therapeutics Holdings, Inc. ("Clarus Holdings") formerly known as Blue Water Acquisition Corporation ("Blue Water"), is a publicly traded company.  Until August 31, 2022, Clarus Holdings' common stock and certain warrants to purchase shares of its common stock[3] were listed on the Nasdaq Global Market under the ticker symbols "CRXT" and "CRXTW," respectively.  On August 31, 2022, its common stock and the publicly-traded warrants were suspended from Nasdaq,[4] and they are currently trading on the OTC Markets' "OTC Pink Market"

---

[3]    Clarus Holdings has a number of outstanding warrants to purchase shares of its common stock.  Only the warrants issued as part of Blue Water's initial public offering are publicly traded.

[4]    On February 18, 2022, Clarus Holdings received two written notifications from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq").  The first notification indicated that as of February 18, 2022, Clarus Holdings did not meet the $15,000,000 minimum market value of publicly held shares required to maintain continued listing as set forth in Nasdaq Marketplace Rule 5450(b)(2)(C) (the "MVPHS Rule") for the 33-business day period ended February 17, 2022. The second notification indicated that as of February 18, 2022, Clarus Holdings did not meet the $50,000,000 minimum market value of listed securities required to maintain continued listing as set forth in Nasdaq Marketplace Rule 5450(b)(2)(A) (the "MVLS Rule" and together with the MVPHS Rule, the "Rules") for the 30-business day period ended February 17, 2022. Clarus Holdings was given 180 days from the date of notification, or until August 17, 2022, to regain compliance with the Rules.  On August 22, 2022, Clarus Holdings received a staff determination letter from Nasdaq notifying it that it had not regained compliance with the

tier, under the ticker symbols "CRXT" and "CRXTW," respectively.  As of the Petition Date, Clarus Holdings has approximately (i) 52,020,731 shares of issued and outstanding common stock, and (ii) outstanding warrants to acquire up to 46,253,304 shares of its common stock with varying exercise prices, expiration dates and rights.

23.     Clarus Holdings wholly owns Clarus, which is the entity that conducts substantially all of the Debtors' operations.

24.     On September 9, 2021, Clarus and Blue Water, a Delaware corporation and special purpose acquisition company, and Blue Water Merger Sub Corporation, a Delaware corporation and wholly-owned subsidiary of the Blue Water ("Merger Sub"), consummated a merger, pursuant to the Agreement and Plan of Merger, dated as of April 27, 2021 (the "Merger Agreement").  Pursuant to the Merger Agreement, among other things, Merger Sub merged with and into Clarus, with Clarus surviving as a wholly owned subsidiary of Blue Water (the "Merger"). Upon the consummation of the Merger, Blue Water changed its name to "Clarus Therapeutics Holdings, Inc." (*i.e.*, Clarus Holdings).  In connection with the Merger, certain of Clarus' equity holders and certain of Clarus' convertible debt and Notes (defined below), and certain other obligations converted into shares of Clarus Holdings' common stock.  As a result of the Merger, the Company received net proceeds of approximately $17.0 million.

C.     **The Debtor's Capital Structure**

25.     Clarus Holdings' primary asset is its 100% equity interest in Clarus.  Clarus' assets consist primarily of cash, receivables, intellectual property related to JATENZO, inventory (JATENZO capsules), contracts, leases and licenses, and business opportunities arising in

---

Rules.  The letter stated that unless Clarus Holdings requested an appeal, Clarus Holdings' common stock would be suspended at the opening of business on August 31, 2022 and that Nasdaq would file a Form 25-NSE with the Securities and Exchange Commission, which will remove Clarus Holdings' securities from listing and registration on the Nasdaq.

connection with JATENZO.  Clarus' U.S. patent portfolio on JATENZO currently includes seven issued patents.[5]  In addition, Clarus has several patent applications pending in the United States and other countries that, if issued, will cover pharmaceutical compositions, methods of treatment and other features of JATENZO, and have the potential to extend patent coverage beyond 2030.

26.    As of the Petition Date, Clarus is holding cash of approximately $8.9 million, exclusive of retainers held by the Debtors' professionals and deposits held by certain of the Debtors' landlords and vendors.

27.    As of the Petition Date, the Debtors' liabilities primarily consist of (i) approximately $11 million for trade and other third-party accounts payable; (ii) rent-related obligations under Clarus' leases for the corporate headquarters in Northbrook, Illinois and an ancillary office space in Murfreesboro, Tennessee;[6] (iii) certain unpaid obligations to former and current employees, and (iv) secured obligations owing under the Indenture (defined below). Although the Debtors' analyses are ongoing, the Debtors believe that substantially all of these liabilities are obligations of Clarus and not of Clarus Holdings.

28.    To fund its launch of JATENZO, Clarus issued 12.5% Senior Secured Notes due 2025 (the "Notes," and the holders thereof, the "Noteholders")[7] pursuant to that certain Indenture dated as of March 12, 2020 (as amended and supplemented by Supplemental Indenture

---

[5]    The Debtors' U.S. patent portfolio on JATENZO currently includes seven issued patents: U.S. Patent No. 11,179,402, which expires in April 2026, U.S. Patent No. 8,241,664, which expires in March 2029; U.S. Patent No. 8,492,369, which expires in December 2030, as well as U.S. Patent Nos. 8,778,916, 10,543,219, 10,617,696, and 11,179,403 each of which expires in April 2030.  The Debtors also have issued patents covering JATENZO in Australia, Canada, China, Costa Rica, Europe, Hong Kong, India, Indonesia, Israel, Japan, Mexico, New Zealand, Philippines, Russia, Singapore, South Africa and South Korea.

[6]    This ancillary office is required by the State of Tennessee in order for JATENZO to be warehoused by Clarus' third-party logistics provider, prior to distribution throughout the United States.

[7]    As of the Petition Date, the Noteholders are: (i) FFI Fund Ltd.; (ii) FYI Ltd.; (iii) Olifant Fund, Ltd.; (iv) Nineteen77 Capital Solutions A LP; (v) Bermudez Mutuari Ltd.; (vi) Bracebridge Capital, LLC; and (vii) UBS O'Connor LLC.

No. 1 dated as of May 27, 2021, Supplemental Indenture No. 2 dated as of September 9, 2021, and Supplemental Indenture No. 3 dated as of September 28, 2021, the "Indenture") among Clarus, as Issuer, and U.S. Bank National Association, as trustee and as collateral agent (the "Indenture Trustee").  Pursuant to the Indenture, Clarus sold and issued Notes to the Noteholders in the amount of $50 million.

29.    On March 17, 2021, Clarus, the Noteholders and the Indenture Trustee entered into that certain Forbearance and Transaction Agreement, pursuant to which the Noteholders agreed to, among other things, amend the Indenture to permit an interest payment on the Notes in the amount of $3,125,000 that was due on March 1, 2021, to be evidenced by Clarus' issuance of PIK Securities (as defined in the Indenture).  In June 2021 and July 2021, in order to provide Clarus with additional liquidity prior to the consummation of the Merger (as described above), the Noteholders agreed to provide additional funding to Clarus in the amounts of approximately $5 million and $3.6 million, respectively, which was evidenced by Clarus' issuance of additional Notes (the "Additional Notes").

30.    In connection with the Merger, the Noteholders agreed to convert $10 million of principal of the Notes, certain royalty rights that Clarus had sold to the Noteholders, and the Additional Notes, to common shares of Clarus Holdings.  Interest on the Notes accrues at a non-default rate of 12.5% per annum, and a default rate of 14.5% per annum.  Clarus is required to pay interest semi-annually in arrears commencing on September 1, 2020.  Commencing on September 1, 2022, Clarus is required to pay principal semi-annually, based on a percentage of the total principal amount of Notes outstanding, in accordance with a table set forth in the Indenture.  On September 1, 2022, Clarus determined that it was unable to make the required payment of principal and interest of $8,695,312.50.

31.     As of the Petition Date, the aggregate principal amount, plus accrued interest, owing by Clarus to the Noteholders under the Indenture is approximately $43,125,000 (not including fees and expenses, including, without limitation, the reasonable and documented fees, disbursements and other charges of counsel to the Indenture Trustee and the Noteholders).

32.     Pursuant to that certain Collateral Agreement dated as of March 12, 2020 (the "Collateral Agreement"), the Notes are secured by a first priority lien on the "Collateral" (as defined in the Collateral Agreement), which is comprised of substantially all of Clarus' assets, except for certain "Excluded Assets" specifically identified in the Collateral Agreement.

33.     Clarus Holdings is not a guarantor of Clarus' obligations under the Indenture, and the Debtors have no other secured or unsecured funded indebtedness.

**A.      Events Leading to Chapter 11 Filing**

34.     The Debtors' business has been almost entirely dependent on the success of JATENZO.  Recently, the Debtors' financial performance has shown an improving trajectory with second quarter 2022 net revenue of $4.1 million, an increase of 45.7% from $2.8 million in the same period in 2021, and an increase in second quarter 2022 total prescription growth for JATENZO of 23% sequentially and 72% year-over-year.  However, because of their liquidity constraints and the ongoing impact of the COVID-19 pandemic—which halted crucial in-person marketing efforts shortly after Clarus commenced U.S. commercial sales of JATENZO in February 2020—the Debtors have not achieved their sales targets.

35.     Despite their improving revenues, the Debtors' development and commercialization costs have outpaced their revenues.  For the six-month period ended June 30, 2022, the Company incurred a net loss of $25.6 million, and a net loss of $40.6 million for the year ended December 31, 2021.  As of June 30, 2022, the Company has an accumulated deficit of $347.2 million.

36.     However, due to a dramatic downturn in the availability of financing in both the debt and equity markets, the Debtors have struggled to raise sufficient funding to continue commercializing JATENZO, and they have been unable to consistently service their debt obligations to the Noteholders pursuant to the Indenture.

37.     In early 2022, in response to their deteriorating cash position, the Debtors focused their efforts on raising capital and began exploring their strategic alternatives, including financings, a potential business combination, an acquisition or other value-maximizing transaction.  In March 2022, after receipt of a non-binding proposal to acquire all of the outstanding common stock of Clarus Holdings, the Board of Directors of Clarus Holdings appointed a Special Committee of the Board (the "Special Committee"), comprised of independent and disinterested directors, to consider any potential strategic transaction.

38.     In April 2022, the Special Committee, on behalf of the Debtors, interviewed several investment banks and ultimately selected and retained Raymond James & Associates, Inc. ("Raymond James") as investment banker to conduct a marketing process to explore opportunities for a strategic transaction and/or a refinancing of the Notes in light of the Debtors' liquidity constraints.  Since being engaged and prior to the Petition Date, Raymond James:

- Prepared marketing materials, including a teaser and 44-page Confidential Information Memorandum ("CIM");

- Organized an initial data room with more than 280 files for parties under non-disclosure agreements (collectively, the "NDAs");

- Identified and contacted 138 parties, comprised of 45 strategic parties, 52 financial buyers and 41 capital providers;

- Collaborated with the Debtors' management to prepare a management presentation;

- Conducted more than 50 calls with prospective parties, many of which included management participation;

- Distributed CIMs to 21 parties under NDAs;

- On May 23, distributed Indication of Interest ("<u>IOI</u>") process letters to interested parties;

- Received non-binding IOIs on or about June 20; and

- On August 4, sent process letters to remaining active parties requesting non-binding Letters of Intent ("<u>LOI</u>") by August 11, 2022.

39.  At approximately the same time as the Raymond James marketing process was commencing, in April 2022, the Debtors successfully obtained an upsized $30 million underwritten public offering of (i) units consisting of 26,680,720 shares of Clarus' Holdings' common stock and accompanying Class A warrants to purchase up to 26,680,720 shares of its common stock; and (ii) units consisting of pre-funded warrants to purchase up to 590,000 shares of Clarus Holdings' common stock and accompanying Class A warrants to purchase up to 590,000 shares of common stock (the "<u>April 2022 Public Offering</u>").

40.  At the time, the Debtors believed that the April 2022 Public Offering would provide the Debtors with additional liquidity to fund operations, pursue a value-maximizing strategic transaction and/or provide additional cash runway for another potential capital raising transaction later in the year.  Throughout the weeks leading up to the August 11 deadline for the submission of non-binding LOIs, the Debtors consulted frequently with their advisors, key

stakeholders, the Special Committee and the Board of Directors to determine the course of action that would most likely maximize value for all of the Debtors' stakeholders.

41.     Despite having received significant and ongoing interest from multiple parties, the Debtors did not receive any LOIs prior to the August 11 deadline for an acceptable transaction that could be consummated out of court.  Since then, Raymond James has continued its marketing efforts, including continuing to engage with the parties that expressed interest in the Debtors' assets regarding their participation as a stalking horse bidder or an ordinary bidder in a chapter 11 process.

42.     Although parties continue to express serious interest in the Debtors' assets, in light of the Debtors' limited available liquidity, and after considering all of their alternatives, the Debtors made the difficult determination that an expedited in-court process was the best alternative to preserve and maximize the value of their business for the benefit of all stakeholders. Accordingly, the Debtors have commenced the Chapter 11 Cases to preserve the value of the Debtors' assets, to maximize going concern value for the benefit the Debtors' stakeholders, and to ensure that JATENZO remains available to patients who rely on it without interruption.  The Debtors anticipate that they will seek approval of appropriate bidding procedures in the early weeks of the Chapter 11 Cases.

43.     As explained in more detail below, the Debtors have negotiated with the Indenture Trustee and the Noteholders for the consensual use of cash collateral in accordance with an Approved Budget, which will provide the funding runway necessary for the Debtors to complete a sale or other restructuring transaction.

\*      \*      \*

# PART II.

## FIRST DAY PLEADINGS

44.     In furtherance of these objectives, the Debtors filed the First Day Motions[8] concurrently with the commencement of the Chapter 11 Cases.  I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, information and belief, the facts set forth therein are true and correct.  Based on my personal knowledge, information supplied to me by and discussions with other members of Debtors' management, Debtors' counsel and professionals and representatives, my review of relevant documents, my opinion based upon my experience and the aforementioned review and discussions, and as set forth in more detail below, I believe the relief sought in the First Day Motions is: (a) vitally necessary for the Debtors to (i) effectuate a smooth transition into, and operate within, the Chapter 11 Cases, (ii) avoid immediate and irreparable harm, and (iii) avoid interruption or disruption to their business and estates to the greatest extent practicable; (b) in the best interests of the Debtors' creditors, estates and other stakeholders; and (c) constitutes a critical element in maximizing value during the Chapter 11 Cases.

## A.     **Administrative Motions**

   1.     ***Debtors' Motion for Order Directing Joint Administration of the Debtors' Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure ("Joint Administration Motion")***

45.     By the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of the Chapter 11 Cases for procedural purposes only.

46.     I believe that joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the U.S. Trustee,

---

[8]     Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion filed contemporaneously herewith.

and the Court.  Specifically, joint administration of the Chapter 11 Cases will permit the Debtors

to avoid incurring substantial time and expense preparing, replicating, filing, and serving duplicate

notices, applications and orders.  I also believe that joint administration will also relieve the Court

of entering duplicative orders and maintaining duplicative files and dockets.  Other parties-in-

interest will similarly benefit from joint administration of the Chapter 11 Cases as they will be

spared the time, effort and expense needed to review duplicative pleadings and papers.

47.    I therefore believe that the relief requested in the Joint Administration

Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest, and

constitutes a critical element of achieving a successful and smooth transition to chapter 11.

> **2.    *Debtors' Motion for Entry of an Order (I) Waiving the Requirement to
> File a List of Equity Security Holders and Modifying Notice
> Requirements to Equity Security Holders, (II) Authorizing the Debtors to
> Redact Certain Personally Identifiable Information for Individual
> Creditors and Parties-In-Interest, and (II) Authorizing the Debtors to
> (A) Maintain and File a Consolidated List of Creditors and (B) File a
> Consolidated List of the Debtors' Twenty Largest Unsecured Creditors
> ("Equity Holders List Motion")***

48.     By the Equity Holders List Motion, the Debtors request an order

(i) waiving the requirement to file a list of the equity security holders (the "Equity List") of Clarus

Holdings and modifying notice requirements to Clarus Holdings' equity security holders,

(ii) authorizing the Debtors to redact certain personally identifiable information for the Debtors'

individual creditors and parties-in-interest, and (iii) authorizing the Debtors to (a) maintain and

file a consolidated list of creditors and (b) file a consolidated list of the Debtors' twenty (20) largest

unsecured creditors.

49.    As described above, Clarus Holdings' common stock and certain warrants

to purchase shares of its common stock are currently trading on the OTC Markets' "OTC Pink

Market" tier.  As of the Petition Date, Clarus Holdings has approximately (i) 52,020,731 shares of

issued and outstanding common stock, and (ii) outstanding warrants to acquire up to 46,253,304 shares of its common stock with varying exercise prices, expiration dates and rights.

50.     Given the number of shares outstanding and because Clarus Holdings' stock is actively traded, beneficial ownership of such common stock is widely dispersed and subject to change.  As such, Clarus Holdings has not historically and does not, as of the Petition Date, maintain a list of its equity security holders.  Therefore, if it is required to file a list of its equity security holders, Clarus Holdings would have to try to obtain the names and addresses of shareholders from transfer agents and brokerage firms.  The process of obtaining such names and addresses, preparing the list of such holders with last known addresses and sending notices to all such holders would be burdensome, time consuming and expensive.  Moreover, beneficial holders of Clarus Holdings' shares may object to the release of their identities, in which case, brokerage firms would not be permitted to disclose their identities, even upon a written request by Clarus Holdings.

51.     I believe that obtaining a list of beneficial holders with last known addressees for each such holder, and providing notice to all such parties, would be a burdensome and expensive process, and would serve little or no beneficial purpose in light of the fact that the transfer agents and brokerage firms have processes in place that would ensure that each beneficial holder obtains requisite notice.

52.     In lieu of providing notice to each of the beneficial holders of Clarus Holdings' equity interests, the Debtors propose to provide notice by: (i) publishing the notice of commencement of the Chapter 11 Cases (the "Notice of Commencement") on the Stretto Website (ii) filing a Form 8-K with the Securities and Exchange Commission (the "SEC") within four (4) business days following the Petition Date, notifying their investors and other parties of the

commencement of the Chapter 11 Cases; and (iii) serving by first class mail, the Notice of Commencement and all other notices in the Chapter 11 Cases on the Transfer Agent and all the Nominees that hold stock in "street name" for the beneficial holders of the equity interest, as applicable.

53.     In addition, the Debtors request authority to redact personally identifiable information from papers filed with the Court in the Chapter 11 Cases.  Such personally identifiable information could be used for unlawful purposes, including identity theft, harassment, or stalking, and may include, among other things, residential addresses of the Debtors' individual creditors, employees, and other parties-in-interest.  The Debtors will, upon reasonable request, provide an unredacted version of the creditor matrix and any other applicable filings to the Court, the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in the Chapter 11 Cases, and other parties-in-interest.

54.     The Debtors also request authority to file a single list of their twenty (20) largest general unsecured creditors on a consolidated basis.  I believe that a single consolidated list of the Debtors' combined 20 largest unsecured creditors in the Chapter 11 Cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.  Indeed, a list of the combined top 20 creditors captures creditors with claims as low as approximately $35,000.  Additionally, the lists for each Debtor may overlap.  In this light, I believe that any marginal benefit to preparing individual creditor lists for each of the Debtors is far outweighed by its burden and expense.

55.     For these reasons, I believe that the relief requested in the Equity Holders List Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest, and constitutes a critical element of achieving a successful and smooth transition to chapter 11.

3.    ***Debtors' Motion For Entry of Interim and Final Orders (I) Establishing Notice and Hearing Procedures For Trading of Clarus Therapeutics Holdings, Incorporated Equity Securities and (II) Granting Related Relief (the "<u>Trading Motion</u>")***

56.    By the Trading Motion, the Debtors request interim and final orders (a) establishing notice and hearing procedures that must be satisfied before certain transfers of equity securities in Clarus are deemed effective; and (b) granting related relief.

57.    The Debtors have significant Tax Attributes, including net operating losses. Although their analysis is ongoing, the Debtors estimate that, as of December 31, 2021, they had approximately $360,850,000 in Tax Attributes, comprised of: (a) federal Tax Attributes of approximately $196,300,000 and (b) combined state Tax Attributes of approximately $164,550,000.

58.    I am advised that Tax Attributes may be valuable assets of the Debtors' estates because under certain circumstances they may be carried forward and used, subject to limitations (as discussed in the Trading Motion), to offset or eliminate Clarus Holdings' future taxable income.  In addition, I am advised that the Tax Attributes may also be available to offset taxable income generated by transactions completed during the Chapter 11 Cases, including the proposed sale of the Debtors' assets under section 363 of the Bankruptcy Code (the "<u>Section 363 Sale</u>").

59.    However, I am also advised that under sections 382 and 383 of the Internal Revenue Code, an "ownership change" can result in the loss of the amount of federal taxable income and federal tax liabilities, respectively, that can be offset by a corporation's Tax Attributes in taxable years (or portions thereof).  Therefore, absent the relief requested in the Trading Motion, trading and accumulation of shares of Clarus Holdings during the pendency of the Chapter 11 Cases could severely limit the Debtors' ability to utilize the value of their Tax Attributes.

60.     I believe the relief sought by the Trading Motion will allow the Debtors to monitor certain transfers with respect to Clarus Holdings' stock that could trigger an "ownership change," so that the Debtors can act expeditiously to prevent such transfers if necessary, to preserve the value of certain Tax Attributes.  This relief will preserve optionality for the Debtors and allow the Debtors to maximize the use and value of their Tax Attributes and otherwise preserve the status quo for the benefit of their estates and their stakeholders.  In addition, it is my understanding that the procedures requested by the Debtors in the Trading Motion would permit most trading in equity securities to continue subject only to Bankruptcy Rules 3001(e) and 3002 and applicable securities, corporate, and other laws.  Therefore, I believe that the benefits to the Debtors and their estates of the requested relief outweighs the theoretical burdens placed on a very small universe of potential transfers.

61.     For the foregoing reasons, I believe that the relief requested in the Trading Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest, and constitutes a critical element to achieving a value-maximizing sale transaction in the Debtors' Chapter 11 Cases.

**4.     *Debtors' Application for Entry of an Order (I) Approving the Retention and Appointment of Stretto as Claims and Noticing Agent, Effective as of the Petition Date, and (II) Granting Related Relief ("<u>Stretto Retention Application</u>")***

62.     The Debtors seek entry of an order appointing Stretto, Inc. ("<u>Stretto</u>") as claims and noticing agent in the Debtors' chapter 11 cases effective as of the Petition Date.

63.     Stretto has acted as the claims and noticing agent in numerous bankruptcy cases of comparable size, including cases currently pending in both the District of Delaware and in other districts.  Additionally, in compliance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c) of the United States Bankruptcy Court for the

District of Delaware, Clarus obtained and reviewed engagement proposals from at least two (2) other Court-approved claims and noticing agents to ensure selection through a competitive process. I believe that Stretto's rates are competitive and reasonable given Stretto's quality of services and expertise. I have worked with Stretto before and have found them to be a highly competent and diligent provider of claims and noticing services.

64.    As more fully detailed in the Stretto Retention Application, I understand that Stretto will engage in certain claims administration and noticing services as necessary, including, but not limited to, the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Chapter 11 Cases. The Stretto Retention Application pertains only to the work to be performed by Stretto under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c) and Local Rule 2002-1(f).[9]

65.    I am advised that Local Rule 2002-1(f) requires the Debtors to retain a claims and noticing agent in the Chapter 11 Cases, as the Debtors' creditor matrix contains more than two-hundred (200) creditors or parties-in-interest. I believe that by appointing Stretto as the as claims and noticing agent in the Chapter 11 Cases, the distribution of notices and the processing of claims will be expedited, and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims. Accordingly, I believe that retention of Stretto is in the best interests of the Debtors and their estates and creditors.

---

[9]    Although the Engagement Agreement (as defined in the Stretto Application) with Stretto contemplates that Stretto will provide services for the Debtors outside the scope of 28 U.S.C. § 156(c), the Debtors will seek authorization by separate application to retain and employ Stretto as administrative advisor pursuant to Bankruptcy Code section 327 in the event that the Debtors require such services.

B.      **Operational Motions**

       1.      *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services ("Utilities Motion")*

66.      By the Utilities Motion, the Debtors move the Court for the entry of interim and final orders (i) approving the Debtors' proposed form of adequate assurance of payment to the Debtors' utilities, as that term is used in Bankruptcy Code section 366 (the "Utility Companies," and individually, a "Utility Company"); (ii) approving the Debtors' proposed procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance; and (iii) prohibiting the Utility Companies from altering, refusing or discontinuing service to or discriminating against the Debtors on the basis of unpaid charges for services rendered prior to the Petition Date or on account of any perceived inadequacy of the Debtors' Proposed Adequate Assurance.

67.      The Debtors fully intend to pay all undisputed postpetition obligations owed to the Utility Companies in a timely manner.  The Debtors expect that cash on hand as of the Petition Date and additional postpetition receipts will be sufficient to pay postpetition obligations owed to the Utility Companies.  Nevertheless, as additional adequate assurance for future utility services, the Debtors propose to deposit an amount equal to the Debtors' aggregate monthly cost of Utility Services, calculated based on the historical average of payments to the Utility Companies over the past twelve (12) months (the "Adequate Assurance Deposit").  The Adequate Assurance Deposit will be held in a newly-created, interest-bearing, segregated account for the benefit of the Utility Companies (the "Adequate Assurance Account") for the duration of the Chapter 11 Cases, with each Utility Company having a right to the Adequate Assurance Deposit in the amount set forth in Schedule 1 of the Utilities Motion for such Utility Company, subject to the Debtors' right

to terminate or discontinue the applicable Utilities Services, and may be applied to any postpetition defaults in payment to the applicable Utility Companies. The Debtors will hold the Adequate Assurance Deposit, and no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

68.     I believe that the Utility Services provided to the Debtors by the Utility Companies are critical to the continuing operations of the Debtors' businesses. Accordingly, preserving the Utility Services on an uninterrupted basis during the Chapter 11 Cases is essential to preserving and maximizing the value of the Debtors' estates.

69.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest, and constitutes a critical element of achieving a successful and smooth transition to chapter 11.

**2.      *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 363, 507(a), 541, 1107(a) and 1108, and Fed. R. Bankr. P. 6003 and 6004, to, Inter Alia, (I) Authorize, But Not Direct, the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits, and Other Employee Obligations; (II) Authorize, But Not Direct, the Debtors to Continue Certain Employee Benefit Programs in the Ordinary Course; (III) Authorize All Banks to Honor Prepetition Checks for Payment of Prepetition Employee Obligations; and (IV) Grant Other Related Relief ("<u>Wages Motion</u>")***

70.     By the Wages Motion, the Debtors request interim and final orders (i) authorizing, but not directing, the Debtors to pay prepetition wages, compensation, employee benefits and other employee obligations, (ii) authorizing, but not directing, the Debtors to continue certain employee benefit programs in the ordinary course, (iii) authorizing all banks to honor prepetition checks for payment of prepetition employee obligations, and (iv) granting other related relief.

71.     As of the Petition Date, the Debtors employ eleven (11) salaried employees and one (1) part-time employee (the "<u>Employees</u>"). Most of the Employees are highly skilled

professionals (many of whom have advanced degrees) with specialized training necessary to operate the Debtors' businesses.  I believe that the Employees' expertise in each of their respective positions, and their understanding of the Debtors' operations are essential to the effective operation of the Debtors' businesses and their ability to achieve a value-maximizing transaction.

72.     I believe the Debtors' Employees are particularly critical to maintaining going-concern value for the estates due to the technical nature of the Debtors' business; the Employees represent much of the core "know-how" that makes up the Debtors' assets.  Thus, retaining the Employees is critical to the Debtors' ability to operate and maximize value in the Chapter 11 Cases.  Accordingly, it is critical that the Debtor be authorized to pay the Employee Obligations and maintain Employee Programs.

73.     In addition, the Debtors request authority to pay up to $15,150 (*i.e.*, up to the Priority Cap) to each of eight (8) former Employees who were terminated less than one month prior to the Petition Date.  These payments comprise only a small fraction of the payments that these former Employees would have expected absent the Debtors' bankruptcy filings, and the Debtors and I believe that a fair and equitable treatment of these former Employees is necessary to maintain existing Employees' morale and goodwill, which is particularly important at this time. The Noteholders have consented to, and support, these payments.

74.     I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest, and constitutes a critical element of achieving a successful and smooth transition to chapter 11.

**3.**     ***Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Perform Intercompany Transactions, and (IV) Maintain Existing Business Forms; (B) Authorizing the Debtors' Banks to Honor All Related Payment Requests; and (C) Granting Related Relief ("Cash Management Motion")***

75.     By the Cash Management Motion, the Debtors move the Court for the entry of interim and final orders, to (i) continue to operate the Cash Management System (as defined in the Cash Management Motion), (ii) honor certain prepetition obligations related thereto, (iii) perform intercompany transactions in the ordinary course of business and consistent with historical practice, and granting administrative expense status for postpetition Intercompany Claims (as defined in the Cash Management Motion), and (iv) maintain existing business forms in the ordinary course of business; (b) authorizing the Debtors' bank to honor all related payment requests; and (c) granting related relief.

76.     As of the Petition Date, Clarus maintained five (5) bank accounts: (i) an operating account held at Silicon Valley Bank (the "Operating Account"); (ii) an inventory account held at Silicon Valley Bank (the "Inventory Account"); (iii) a sweep account held at Silicon Valley Bank (the "Sweep Account"); (iv) a health reimbursement account held at Silicon Valley Bank (the "Health Reimbursement Account"); and (v) an investment account with Silicon Valley Bank Asset Management (the "Investment Account"). All of these bank accounts are owned by Debtor Clarus Therapeutics, Inc. ("Clarus"). Debtor Clarus Therapeutics Holdings, Inc. ("Clarus Holdings"), does not maintain a bank account in its name.

77.     Through the Cash Management Motion, the Debtors request authority to: (i) continue to use, with the same account number, the Operating Account and the Health Reimbursement Account (collectively, the "Post-Petition Operating Accounts"); (ii) treat the Post-Petition Operating Accounts for all purposes as accounts of the Debtors as debtors in possession;

(iii) conduct banking transactions by all usual means and debit related to the Post-Petition Operating Accounts on account of all usual items and payment instructions; and (iv) close the Sweep Account, Inventory Account and the Investment Account during the Chapter 11 Cases and to transfer all of the remaining funds from each such account into the Operating Account.

78.     I believe any disruptions in the Cash Management System could lead to delays in satisfying the Debtors' obligations to employees, vendors and suppliers, which could erode value for the Debtors' estates.  Therefore, it is imperative that they be authorized to continue the Cash Management System consistent with the Debtors' historical practice, subject to the limitations proposed in the Cash Management Motion, including that the Debtors will only use the Post-Petition Operating Accounts during the Chapter 11 Cases.

79.     In the ordinary course of business, the Debtors engage in only a very limited number of intercompany cash transactions.  Most intercompany transactions arise from Clarus periodically satisfying certain payment obligations of Clarus Holdings as they come due in the ordinary course, which generate Intercompany Claims.  In particular, Clarus satisfies Clarus Holdings' obligations to, among others, certain employees and directors, and taxing and regulatory authorities.

80.     I believe the Debtors can ascertain, trace, and account for the Intercompany Transactions, and will do so on a postpetition basis.  The Debtors anticipate that a limited number of Intercompany Transactions will continue postpetition in the ordinary course of business.  I believe the Debtors' ability to continue to participate in Intercompany Transactions in the ordinary course will minimize the disruption caused by the Chapter 11 Cases and maximize the value of the Debtors' estates.

81.     In addition, I believe the Debtors' ability to continue to use Business Forms will minimize expenses to the Debtors' estates and avoid confusion on the part of employees, vendors, and suppliers during the pendency of the Chapter 11 Cases.

82.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest, and constitutes a critical element of achieving a successful and smooth transition to chapter 11.

**4.      Debtors' Motion for Interim and Final Orders Authorizing (I) the Debtors to (A) Maintain Existing Insurance Policies and Pay All Obligations Arising Thereunder; and (B) Renew, Revise, Extend, Supplement or Enter into New Insurance Policies; and (II) the Debtors' Banks to Honor Related Checks and Transfers ("Insurance Motion")**

83.     By the Insurance Motion, the Debtors seek entry of interim and final orders, (i) authorizing, but not directing, the Debtors to (a) maintain their existing insurance policies and pay all obligations arising thereunder or in connection therewith; (b) renew, revise, extend, supplement or enter into new insurance coverage as needed in their business judgment, and (ii) authorizing the Debtors' banks to honor related checks and transfers.

84.     The Debtors maintain various insurance policies providing coverage for, among other things, workers' compensation, directors and officers liability, commercial excess liability and umbrella, crime, automobile, package (covering property, liability, crime, and various international policies) and life science product professional liability (each an "Insurance Policy" and, collectively, the "Insurance Policies").  The Insurance Policies are obtained from various insurance carriers (each an "Insurance Carrier" and, collectively, the "Insurance Carriers").

85.     I believe the Insurance Policies are essential to the preservation of the value of the Debtors' business, properties and assets.  Also, I am advised that some of the Insurance Policies are required by various regulations, laws and contracts that govern the Debtors' commercial activities, and that maintaining insurance coverage is required under the Bankruptcy

27

Code and by the Operating Guidelines for Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware.

86.    As of the Petition Date, the Debtors are current on all of their Insurance Obligations.  However, out of an abundance of caution, the Debtors request authority to continue to pay their Insurance Obligations in the ordinary course of business.

87.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors and all parties-in-interest, and constitutes a critical element of achieving a successful and smooth transition to chapter 11.

> **5.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtor Clarus Therapeutics, Inc. to Use Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Schedule Final Hearing, and (IV) Granting Related Relief ("<u>Cash Collateral Motion</u>")***

88.    By the Cash Collateral Motion, the Debtors request interim and final orders: (i) authorizing Clarus' use of Cash Collateral and all other Collateral, subject to the terms and conditions set forth therein; (ii) granting certain adequate protection to the Indenture Trustee, for the benefit of the Secured Parties; (iii) subject to and upon entry of a Final Order, waiving Clarus' and its estate's right to surcharge against the Collateral pursuant to section 506(c) of the Bankruptcy Code, effective as of the Petition Date; (iv) vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the Indenture Trustee to implement and effectuate the terms and provisions of the orders; (v) scheduling the Final Hearing within thirty (30) days after entry of the Interim Order to consider entry of the Final Order; and (vi) granting related relief.

89.    I believe the ability of the Debtors to finance their operations and complete a successful chapter 11 sale process and value-maximizing transaction requires immediate continued use of Cash Collateral and the other Collateral.  In the absence of the use of Cash

Collateral and the other Collateral, the Debtors would be unable to continue operating their business and there would occur immediate and irreparable harm to the Debtors, their estates and their creditors. The Debtors do not have sufficient available sources of working capital and financing to operate their business in the ordinary course without the use of Cash Collateral.

90.    Therefore, I believe the relief requested in the Cash Collateral Motion is necessary for the continued operation of the Debtors' business and the preservation of their property, and thus is in the best interests of the Debtors, their estates and their creditors.

91.    In the weeks leading to the Petition Date, the Secured Parties and the Debtors have negotiated at arm's-length and in good faith regarding Clarus' use of Cash Collateral to fund the continued operation of the Debtors' business during the period from the Petition Date through the earlier of October 28, 2022 at 5:00 p.m. (prevailing Eastern Time) and the Termination Date (*i.e.*, a triggering event as described in the Interim Order) pursuant to an Approved Budget. The Secured Parties have also agreed to fund the orderly wind-down of the Debtors following the closing of a sale transaction pursuant to a Wind-Down Budget.

92.    As a condition to the Secured Parties consenting to the use of Cash Collateral, the Debtors have agreed to provide adequate protection to the Secured Parties in the form of, among other things, periodic cash payments, adequate protection liens and superpriority claims, to the extent of the Diminution in Value (as defined in the Interim Order).

93.    The Debtors and the Secured Parties negotiated at arms' length regarding the terms of Clarus' use of the Collateral, including Cash Collateral, as set forth in the Interim Order, the Approved Budget and the Wind-Down Budget. I believe that the agreed-upon adequate protection package is fair and appropriate under the circumstances of the Chapter 11 Cases.

94.     I believe that access to existing Cash Collateral will provide the Debtors with the liquidity necessary to continue to operate their business, which is necessary to achieve a successful chapter 11 sale process or other value-maximizing transaction.  Without access to such liquidity, the Debtors' ability to navigate through chapter 11 would be jeopardized, to the detriment of the Secured Parties and all of the Debtors' other stakeholders.  As a result, Clarus has an immediate need to use Cash Collateral to ensure access to sufficient working capital to administer the Chapter 11 Cases.

95.     For these reasons, and as further described in the Cash Collateral Motion, I believe the relief requested therein is in the best interests of the Debtors' estates, their creditors, and all other parties -in-interest, and will enable the Debtors to continue to manage their business operations while the Debtors are in chapter 11 without disruption in order to maximize the estates' value.

**C.    Motion to Shorten Notice**

*1.    **Debtors' Motion for Entry of an Order Shortening and Limiting Notice With Respect to the Debtors' Bidding Procedures Motion ("Motion to Shorten Notice")***

96.     On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Designate a Stalking Horse Bidder and to Provide Bidding Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Bidding Procedures Motion").

30

97.     By the Motion to Shorten Notice, the Debtors move the Court for the entry of an order shortening notice with respect to the Bidding Procedures Motion.  Specifically, the Debtors are seeking to shorten (i) the twenty-one (21) day notice period applicable to the Bidding Procedures Motion by four (4) days to September 23, 2022, and (ii) the fourteen (14) day objection deadline period by one (1) day to September 19, 2022.

98.     Due to the Debtors' liquidity constraints, including cash collateral use restrictions that require strict adherence to expedited sale milestones, it is crucial that the Bidding Procedures be approved on the proposed timeline such that the Auction, sale, and closing can occur without undue delay.  Moreover, as described in detail in the Motion to Shorten Notice and in the Bidding Procedures Motion, more than four (4) months ago the Debtors and their advisors, including Raymond James, began and have continued to engage in an extensive marketing process, pursuant to which known prospective bidders were afforded access to a data room and undertook due diligence.

99.     Therefore, I believe the limited relief requested in the Motion to Shorten Notice is necessary and appropriate, in light of the Debtors' liquidity constraints and extensive prepetition marketing efforts, and will permit prospective bidders to have clear guideposts regarding process and therefore maximize value for the benefit of all stakeholders.

100.     For the foregoing reasons, as more fully set forth in the Motion to Shorten Notice, I believe that the relief requested therein is in the best interests of the Debtors' estates, their creditors and all parties-in-interest.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true correct.

Dated: September 5, 2022
   Nashville, Tennessee

            By: */s/ Lawrence R. Perkins*
            Name: Lawrence R. Perkins
            Title:  Chief Restructuring Officer